UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

_____
                                    )
ANGELA CLEMENTE,                    )
                                    )
        Plaintiff,                  )
                                    )
    v.                              )        Civil Action No. 08-1252 (PLF)
                                    )
FEDERAL BUREAU OF                   )
INVESTIGATION, *et al.*,            )
                                    )
        Defendants.                 )
_____)

OPINION

        This Freedom of Information Act case is before the Court on the parties' cross-

motions for summary judgment.  After the parties had filed their initial motions for summary

judgment, the defendant Federal Bureau of Investigation released additional documents to the

plaintiff.  The FBI and its co-defendant, the Department of Justice, then filed a second,

supplemental motion for summary judgment, while the plaintiff filed a supplemental

memorandum in support of her cross-motion.  Upon consideration of the parties' arguments, the

documents released by the FBI, and the entire record in this case, the Court will grant in part and

deny without prejudice in part all three motions: the defendants' two motions for summary

judgment and the plaintiff's cross-motion.[1]  As described in this Opinion, the FBI will be

_____

        [1]        The documents reviewed by the Court in connection with this matter include:
plaintiff's original complaint ("Compl."); plaintiff's first amended complaint ("1st Am.
Compl."); plaintiff's second amended complaint ("2d Am. Compl."); defendants' motion for
summary judgment ("DMSJ"); Declaration of David M. Hardy (attached to DMSJ) ("1st Hardy
Decl."); DMSJ, Ex. A (letter from Angela Clemente to FBI dated Apr. 12, 2008) ("First
Request"); DMSJ, Ex. C (letter from James Lesar to David Hardy dated July 9, 2008) ("First July
9, 2008 Letter"); DMSJ, Ex. I ("First Vaughn Index"); plaintiff's cross-motion for summary
judgment ("PMSJ"); Declaration of Angela Clemente (attached to PMSJ) ("1st Clemente
Decl."); defendants' opposition to PMSJ (labeled a "reply") ("Opp. to PMSJ"); plaintiff's reply

required to supplement its <u>Vaughn</u> index, after which the parties may file renewed motions for summary judgment with regard to any of the plaintiff's claims still outstanding at that time.

## I. BACKGROUND

Plaintiff Angela Clemente works as a "forensic analyst and paralegal" specializing in the investigation of, among other things, "systemic governmental misconduct within the FBI's New York office and the U.S. Attorney[']s Office for the Eastern District of New York." 1st Clemente Decl. ¶¶ 2-3. In particular, Ms. Clemente has devoted considerable time to researching Gregory Scarpa, Sr., a high-ranking member of the Mafia who, beginning in 1961, also served as an informant for the FBI. <u>Id.</u> ¶ 4; <u>see also</u> PMSJ, Ex. 8, attach. 2 at 18 n.17; PMSJ, Ex. 10. According to Ms. Clemente, during his decades-long tenure as a "top echelon" informant for the FBI, Mr. Scarpa committed several murders of which his FBI handlers were or should have been aware. PMSJ at 2. Indeed, Ms. Clemente alleges that in some instances, the FBI commissioned Mr. Scarpa "to commit violent crimes" against targets of FBI investigations. 1st Clemente Decl. ¶ 5; PMSJ, Ex. 10 at 3.

Ms. Clemente's contentions, though seemingly sensational, are supported by mainstream media accounts and court documents concerning Mr. Scarpa. <u>See</u>, <u>e.g.</u>, <u>People v. Devecchio</u>, No. 6825/05, 2007 N.Y. Misc. LEXIS 7827 (N.Y. Sup. Ct. Nov. 1, 2007) (submitted

---

in support of PMSJ ("PMSJ Reply"); defendants' supplemental motion for summary judgment ("D. Supp."); defendants' statement of facts not in dispute (attached to D. Supp.) ("D. Supp. SMF"); Second Declaration of David M. Hardy (attached to D. Supp.) ("2d Hardy Decl."); D. Supp., Ex. C ("Second <u>Vaughn</u> Index"); plaintiff's supplemental memorandum in support of PMSJ ("P. Supp."); defendants' opposition to P. Supp. ("Opp. to P. Supp."); plaintiff's opposition to D. Supp. ("Opp. to D. Supp."); plaintiff's reply in support of P. Supp. ("P. Supp. Reply").

as PMSJ, Ex. 16); Fredric Dannen, *The G-Man and the Hit Man*, NEW YORKER, Dec. 16, 1996 (submitted as P. Supp., Ex. 3). In 2007, Lindley DeVecchio, formerly Mr. Scarpa's FBI handler, was prosecuted in New York for four murders committed, allegedly with Mr. DeVecchio's indirect assistance, by Gregory Scarpa, Sr. See PMSJ, Ex. 9, attach. 2 at 1; People v. Devecchio, 2007 N.Y. Misc. LEXIS 7827. The case against Mr. DeVecchio was dismissed when the prosecution's chief witness, the former mistress of Mr. Scarpa, was found to lack credibility. See People v. Devecchio, 2007 N.Y. Misc. LEXIS 7827, at *7. Ms. Clemente provided assistance to the special district attorney subsequently appointed to investigate the possibility that the discredited witness had committed perjury. See PMSJ, Ex. 8, attach. 2 at 18.

On April 12, 2008, Ms. Clemente sent a letter to the records division of FBI headquarters ("FBIHQ"), requesting "copies of the entire UNREDACTED FBI file of Gregory Scarpa Sr." 2d Am. Compl., Ex. 1. She sent a second copy of the letter to FBIHQ on May 21, 2008. Id., Ex. 2. The FBI confirmed by letter dated June 9, 2008, that it had received Ms. Clemente's letters and was processing them as requests made under the Freedom of Information Act ("FOIA"). See id., Ex. 3. In a letter dated July 9, 2008, and marked as sent "via certified mail," Ms. Clemente's counsel informed the FBI that, having retained an attorney, Ms. Clemente "wish[ed] to clarify her request" for documents "in certain respects." Id., Ex. 4 at 1. Specifically, Ms. Clemente's FOIA request was "directed to any informant file on Mr. Scarpa, including in particular any Top Echelon ('TE') Informant File." Id. Furthermore, Ms. Clemente requested that any responsive documents located by the FBI be placed in the following order: first, "all records pertaining to New Orleans Mafia Chief Carlos Marcello," about whom Mr. Scarpa may have provided information to the FBI, and who "is suspected by some of having been

involved in the assassination of President Kennedy"; second, "all records pertaining to any trip made by Scarpa to Costa Rica"; and third, all remaining responsive documents, placed "in chronological sequence, commencing with the earliest date through latest date." Id. at 1-2. Once the documents had been ordered as requested, Ms. Clemente asked that she be sent copies of only "the first 500 pages." Id. at 1. She also requested a waiver of copying and processing fees. Id. at 2.

According to Ms. Clemente, in addition to that first letter dated July 9, 2008 ("First July 9 Letter"), she also sent the FBI a second letter dated July 9, 2008 ("Second July 9 Letter"). See 2d Am. Compl. ¶ 24; id., Ex. 9. Unlike the First July 9 Letter, the second letter was not marked as having been sent via certified mail and bore no tracking number. Compare 2d Am. Compl., Ex. 9 at 1, with id., Ex. 3 at 1. The second letter contained a set of instructions from Ms. Clemente regarding her FOIA request that differed substantially from, and in some ways conflicted with, the instructions in the First July 9 Letter. In the second letter, Ms. Clemente's counsel stated that his client "requests all records on or pertaining to Gregory Scarpa wherever they may be located or filed in whatever form or format they are maintained." Id., Ex. 9 at 1. He also requested that the FBI do the following: "search your Central Records System for all main files and all 's[e]es' or cross-references" relating to Mr. Scarpa; provide to Ms. Clemente copies of "cross-refererence [sic] materials," including "not only the initial page of the cross-[re]ferencing document and those pages to wh[i]ch [Mr. Scarpa's] name is indexed but the entire document"; "search your electronic surveillance . . . for all references to Mr. Scarpa"; and "use all nicknames, aliases, pseudonyms, or code names used by Mr. Scarpa" in searching FBI databases for responsive documents. Id. at 1-2 (emphasis in original). The Second July 9 Letter

did not mention Carlos Marcello or any trips by Mr. Scarpa to Cuba, nor did it limit to 500 the number of responsive pages that Ms. Clemente wished to receive.

In a letter dated October 10, 2008, David M. Hardy of the FBIHQ's Records Management Division informed Ms. Clemente that her request for a fee waiver had been denied. See 2d Am. Compl., Ex. 7 at 1. He then stated his understanding that Ms. Clemente's July 9, 2008 letter to FBIHQ had notified the agency that Ms. Clemente wished to "limit her request to the first 500 pages which fall within three categories: (1) all records pertaining to New Orleans Mafia Chief Carlos Marcello; (2) all records pertaining to any trip made by Scarpa to Costa Rica; (3) all records in any informant file in chronological sequence." Id. at 2. The agency had located "approximately 1170 pages which are potentially responsive" to Ms. Clemente's request, and Ms. Clemente would be required to pay duplication costs if she elected to receive copies of any of those pages. Id. at 2. Mr. Hardy made no reference to any of the instructions contained in the Second July 9 Letter, and the FBI maintains that it never received that letter at all. See, e.g., Opp. to PMSJ at 1.

In response to Mr. Hardy's letter, Ms. Clemente sent the FBI a check for $107.00 — enough to cover the duplication fees for all 1170 documents located by the FBI. See DMSJ, Ex. G. She also appealed the denial of her request for a fee waiver. She then filed this action on July 21, 2008, before she had received any substantive response to her requests from the FBI, and named as defendants the FBI, the Department of Justice, and ten "Joe Doe Agenc[ies]." See Compl. at 1. The complaint contained two counts. The first, entitled "Scarpa Information Files," alleged that Ms. Clemente had filed a FOIA request with FBIHQ, and that the agency had failed to supply the requested documents. Id. ¶¶ 7-14. In particular, Ms. Clemente claimed that she had

requested and not received the following:

> . . . the first 500 pages [in "the file on SCARPA"] falling within the following three categories:
>
> > (a) all records pertaining to New Orleans Mafia Chief Carlos Marcello;
> >
> > (b) all records pertaining to any trip SCARPA made to Costa Rica;
> >
> > (c) all records in any informant file in chronological sequence. . . .

Id. ¶ 10.  Count II of the complaint alleged that the FBI had wrongfully denied Ms. Clemente's request for a fee waiver.  See id. ¶¶ 15-18.  The complaint neither referred to nor included a copy of the Second July 9 Letter.  A subsequently filed amended complaint also made no mention of the second letter.  See 1st Am. Compl.

On November 24, 2008, the FBI released 500 pages of documents to Ms. Clemente and filed a motion for summary judgment.  See DMSJ, Ex. I.  In response, Ms. Clemente, with leave from the Court, filed a second amended complaint.  That complaint contains the same two counts as the first two complaints, plus a third count, which is based in part on Ms. Clemente's allegation that "[b]y letter dated July 9, 2008, [she] submitted [to FBIHQ] a second, expanded request for records pertaining to SCARPA."  2d Am. Compl. ¶ 24. A citation following that allegation refers to the Second July 9 Letter, which is appended to the second amended complaint as an exhibit.  See id.  Ms. Clemente alleges further that

> [t]he FBI has to date not directly acknowledged this request, except to the extent that its letter of October 10, 2008, indicates that it has processed approximately 1,170 pages of responsive records, more than double the number of pages responsive to CLEMENTE's

<blockquote>
April 12/May 21, 2008 request as modified by her first June 9, 2008 letter limiting that request to 500 pages.
</blockquote>

Id. ¶ 25.  The third count of the second amended complaint thus appears to raise two separate but related issues: (1) whether the FBI received and responded appropriately to the Second July 9 Letter, and (2) to what extent information contained in responsive documents not falling within the first 500 pages initially released to Ms. Clemente must be disclosed under the FOIA.

On March 3, 2009, the FBI released 653 additional pages of responsive records to Ms. Clemente, bringing the total released to approximately 1,170.  D. Supp. SMF ¶ 4.  On March 13, 2009, Ms. Clemente filed a cross-motion for summary judgment.  The FBI and the Department of Justice filed a second, supplemental motion for summary judgment several months later.

The pending motions for summary judgment concern three issues corresponding to the three counts of Ms. Clemente's complaint: (1) whether Ms. Clemente is entitled to a waiver of the search and duplication fees associated with her FOIA request; (2) whether the FBI met its obligations under the FOIA in releasing the first 500 documents requested by Ms. Clemente; and (3) whether the FBI complied with the FOIA in releasing an additional 650 documents to the plaintiff in March of 2009.  The Court will address those issues in two stages, first discussing the plaintiff's request for a fee waiver, and then evaluating the extent to which the FBI has conducted an adequate search for responsive documents and released any information that must be disclosed under the FOIA.

## II. STANDARD OF REVIEW

### A.  The Freedom of Information Act

The fundamental purpose of the FOIA is to assist citizens in discovering "*what their government is up to.*"  Dep't of Justice v. Reporters Comm. for Freedom of the Press, 489 U.S. 749, 773 (1989) (emphasis in original).  The FOIA strongly favors openness, as Congress recognized in enacting it that an informed citizenry is "vital to the functioning of a democratic society, needed to check against corruption and to hold the governors accountable to the governed."  NLRB v. Robbins Tire & Rubber Co., 437 U.S. 214, 242 (1978); see also Dep't of the Air Force v. Rose, 425 U.S. 352, 361 (1976) (purpose of the FOIA is "to pierce the veil of administrative secrecy and to open agency action to the light of public scrutiny").  Thus, "disclosure, not secrecy, is the dominant objective of the Act."  Dep't of the Air Force v. Rose, 425 U.S. at 361.

### B.  Summary Judgment

The Court will grant a motion for summary judgment if the pleadings, the discovery and disclosure materials on file, and any affidavits or declarations show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law.  FED. R. CIV. P. 56(c).  The moving party bears the burden of demonstrating the absence of a genuine issue of material fact.  Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986).  Factual assertions in the moving party's affidavits or declarations may be accepted as true unless the opposing party submits its own affidavits or declarations or documentary evidence to the contrary.  Neal v. Kelly, 963 F.2d 453, 456 (D.C. Cir. 1992).

FOIA cases typically and appropriately are decided on motions for summary judgment.  See Defenders of Wildife v. U.S. Border Patrol, 623 F. Supp. 2d 83, 87 (D.D.C. 2009); Bigwood v. United States Agency for Int'l Dev., 484 F. Supp. 2d 68, 73 (D.D.C. 2007); Farrugia v. Executive Office for United States Attorneys, Civil Action No. 04-0294, 2006 WL 335771, at *3 (D.D.C. Feb. 14, 2006).  In a FOIA case, the Court may award summary judgment solely on the basis of information provided in affidavits or declarations when the affidavits or declarations are "relatively detailed and non-conclusory," SafeCard Servs., Inc. v. SEC, 926 F.2d 1197, 1200 (D.C. Cir. 1991), and describe "the documents and the justifications for nondisclosure with reasonably specific detail, demonstrate that the information withheld logically falls within the claimed exemption, and are not controverted by either contrary evidence in the record nor by evidence of agency bad faith."  Military Audit Project v. Casey, 656 F.2d 724, 738 (D.C. Cir. 1981); see also Vaughn v. Rosen, 484 F.2d 820, 826-27 (D.C. Cir. 1973), cert. denied, 415 U.S. 977 (1974); Hertzberg v. Veneman, 273 F. Supp. 2d 67, 74 (D.D.C. 2003).  An agency must demonstrate that "each document that falls within the class requested either has been produced, is unidentifiable, or is wholly [or partially] exempt from the Act's inspection requirements."  Goland v. CIA, 607 F.2d 339, 352 (D.C. Cir. 1978); see also Students Against Genocide v. Dep't of State, 257 F.3d 828, 833 (D.C. Cir. 2001); Hertzberg v. Veneman, 273 F. Supp. 2d at 74.

## III.  FEE WAIVER

An agency may charge fees for the search for and duplication of records released in response to a FOIA request unless the requester is eligible for a statutory fee waiver.  See

5 U.S.C. § 552(a)(4)(A)(ii)-(iii).  Ms. Clemente maintains that the FBI should not have required her to pay $107.00 in fees because she was entitled to a "public interest" fee waiver.  <u>See</u> PMSJ at 9-13.  A requester qualifies for such a waiver "if disclosure of the information [she seeks] is in the public interest because it is likely to contribute significantly to public understanding of the operations or activities of the government and is not primarily in the commercial interest of the requester."  5 U.S.C. § 552(a)(4)(A)(iii).  The Court reviews an agency's decision to deny a fee waiver request <i>de novo</i>, but may rely only upon the record that was before the agency.  <u>See</u> <u>id</u>. § 552(a)(4)(A)(vii).

Both before the agency and before a reviewing court, the FOIA requester bears the burden of demonstrating that she meets the statutory requirements for a waiver of fees.  <u>Judicial Watch, Inc. v. Rossotti</u>, 326 F.3d 1309, 1312 (D.C. Cir. 2003).  Relevant factors to be considered in determining whether "disclosure of the information . . . is likely to contribute significantly to public understanding" of government activities include the following: (1) "[w]hether the subject of the requested records concerns 'the operations or activities of the government'"; (2) whether the records sought are "'likely to contribute' to an understanding of" those government activities; (3) whether disclosure would aid the understanding of the "public" — that is, "a reasonably broad audience of persons interested in the subject"; and (4) whether any such contribution to public understanding would be "significant."  28 C.F.R. § 16.11(k)(2)(i)-(iv) (Department of Justice's regulations concerning FOIA fee waivers); <u>see also</u> <u>Judicial Watch, Inc. v. Rossotti</u>, 326 F.3d at 1312 (considering similar regulations in determining whether an agency properly denied a fee waiver request).  The third factor, regarding whether disclosure of the requested information would aid the understanding of the "public," is frequently addressed by assessing the requester's

10

ability to disseminate information to at least a segment of the public.  See 28 C.F.R. §

16.11(k)(2)(iii); see also Judicial Watch, Inc. v. Rossotti, 326 F.3d at 1314; Larson v. CIA, 843

F.2d 1481, 1483 (D.C. Cir. 1988).

As to the second prong of the statutory requirement — the proviso that the record

request must not be "primarily in the commercial interest of the requester" — pertinent

considerations include "[w]hether the requester has a commercial interest that would be furthered

by the requested disclosure" and, if so, "[w]hether any identified commercial interest . . . is

sufficiently large, in comparison with the public interest in disclosure, that disclosure is

'primarily in the commercial interest of the requester.'" 28 C.F.R. § 16.11(k)(3)(i)-(ii).  The

FOIA's fee waiver requirements are to "be liberally construed in favor of waivers for

noncommercial requesters."  Judicial Watch, Inc. v. Rossotti, 326 F.3d at 1312.

In her letter to the FBI requesting a waiver of search and duplication fees, Ms.

Clemente claimed that the documents she had requested would "shed light on (1) what the FBI

knew about Scarpa's murderous activities while he was serving as its informant; (2) the extent to

which Scarpa's relationship with the FBI corrupted the system of justice; (3) whether the FBI

violated the JFK Records Act by failing to identify and turn over to the National Archives

informant materials on Carlos Marcello; and (4) the relationship between Scarpa, known as 'the

Grim Reaper,' and former FBI Director J. Edgar Hoover and other high-ranking FBI officials."

2d Am. Compl., Ex. 4 at 2.  In a subsequent letter dated August 19, 2008, as evidence of her

ability to disseminate any information she gleaned from released FBI records, Ms. Clemente

stated that she had been interviewed by a representative of the television program "Inside

Edition" regarding her research on Gregory Scarpa.  PMSJ, Ex. 7.  That interview had not aired,

11

however.  Id.  Ms. Clemente also referred the FBI to an article published in the *New York Times* on July 22, 2008.  Entitled "Lawsuit Seeks Mob Link to '63 Kennedy Killing," the article describes Ms. Clemente's efforts to obtain Mr. Scarpa's informant file from the FBI, portraying her actions as an attempt to gain access to documents "related to Carlos Marcello, a New Orleans don suspected by some of having played a role in the Kennedy assassination on Nov. 22, 1963."  PMSJ, Ex. 9 (attach. 1).

 The FBI denied Ms. Clemente's fee waiver request.  While conceding that the records she sought "concern[] 'the operations or activities of the government,'" the agency rejected as "merely speculative" Ms. Clemente's claim that disclosure of the documents would contribute to public understanding of government activities.  PMSJ, Ex. 8 at 2.  Furthermore, the FBI found that Ms. Clemente had failed to demonstrate that she is capable of conveying information to the public; her letters "evidence[d] only a record of one self-generated newspaper article, and interviews that have not aired or are speculative at some point in the future."  Id.  Finally, according to the FBI, "no evidence has been presented so far on behalf of Ms. Clemente to demonstrate that she is pursuing this request other than in her commercial interest."  Id.

 The Court must conclude that the FBI did not properly assess the evidence before it.  Ms. Clemente explained in her letter first requesting a waiver of fees that the information contained in the FBI's file on Gregory Scarpa would clarify the extent to which federal law enforcement officers had been aware of the "murderous activities" of their informant.  2d Am. Compl., Ex. 4 at 2.  There can be little doubt that the public has considerable interest in knowing the extent to which the FBI countenances the criminal behavior of its informants.  Ms. Clemente's suggestion that FBI agents committed misconduct in supervising Mr. Scarpa is

removed from the realm of the "merely speculative" by the *New York Times* article she submitted in support of her application for a fee waiver. That article described Mr. Scarpa as leading "a stunning double life as a hit man for the Colombo crime family and . . . a 'top echelon' informant for the [FBI]." PMSJ, Ex. 9 (attach. 1). It also referred to the prosecution for murder of Mr. Scarpa's FBI handler, Lindley DeVecchio, and to Mr. Scarpa's "publicly acknowledged role in helping the Kennedy administration learn the whereabouts of three slain civil rights workers by traveling to Mississippi to threaten a member of the Ku Klux Klan." Id. Those details clearly suggest that the FBI's involvement with Mr. Scarpa may have exceeded appropriate bounds, and that Ms. Clemente's contentions were not merely conclusory or speculative. Ms. Clemente thus sufficiently demonstrated that she sought documents whose disclosure would likely improve the public's understanding of the FBI's activities related to a very high profile informant.

According to the FBI, the *New York Times* article submitted by Ms. Clemente was merely "one self-generated newspaper article" and so unpersuasive as evidence of her ability to disseminate information to the public. PMSJ, Ex. 8 at 2. That the article is "self-generated," however, is hardly a mark against Ms. Clemente; if she can "self-generate" an article about her FOIA request in a very prominent national newspaper, then she has shown considerable capacity to disseminate information to the public. While Ms. Clemente did submit just one article to the FBI, that article concerned the very subject matter of her FOIA request and appeared in one of the most widely circulated newspapers in the United States. Such evidence is sufficient to show Ms. Clemente's ability to convey information about her FOIA request and its results to the public.

Finally, the FBI erred in denying Ms. Clemente's waiver request on the ground that "no evidence has been presented . . . to demonstrate that she is pursuing this request other than in her commercial interest." PMSJ, Ex. 8 at 2. The FBI has pointed to nothing in the record which suggests that Ms. Clemente has a commercial interest in the information she has requested, nor can the Court discern any such interest based on its own review of the record. As a result, Ms. Clemente's request for a fee waiver cannot properly be denied on the ground that her interest is primarily commercial. See Larson v. CIA, 843 F.2d at 1483 ("nothing in the record indicates that [the FOIA requester] had a commercial interest in obtaining [the] information [sought] . . . . Therefore, [the requester] satisfies" the commercial interest prong of the FOIA's test for eligibility for a public interest fee waiver); see also Linn v. Dep't of Justice, Civil Action No. 92-1406, 1995 WL 631847, at *13 (D.D.C. Aug. 22, 1995). Because the information Ms. Clemente seeks is likely to contribute to the public's understanding of the FBI's activities, and there is no reason to believe that her interests are primarily, if at all, commercial, she is entitled to a waiver of fees under the FOIA.

IV. ADEQUACY OF FBI'S SEARCH FOR AND DISCLOSURE OF
RESPONSIVE DOCUMENTS

Ms. Clemente contends that the FBI's efforts to locate documents responsive to her request were inadequate, see PMSJ at 15, and that the FBI has wrongfully withheld certain documents or portions of documents as exempt from disclosure under the FOIA. Id. at 18-41. Although the Court finds that the FBI's search was adequate and that most claimed exemptions were properly invoked, it cannot determine based on the evidence submitted by the FBI whether

all information subject to disclosure has been released.  The FBI therefore will be required to supplement its submissions to the Court.

Upon receipt of a request under the FOIA, an agency must search its records for responsive documents.  See 5 U.S.C. § 552(a)(3)(A).  "An agency fulfills its obligations under FOIA if it can demonstrate beyond material doubt that its search was 'reasonably calculated to uncover all relevant documents.'"  Valencia-Lucena v. United States Coast Guard, 180 F.3d 321, 325 (D.C. Cir. 1999) (quoting Truitt v. Dep't of State, 897 F.2d 540, 542 (D.C. Cir. 1990)); see also Campbell v. U.S. Dep't of Justice, 164 F.3d 20, 27 (D.C. Cir. 1998).  The agency bears the burden of showing that its search was calculated to uncover all relevant documents.  Steinberg v. United States Dep't of Justice, 23 F.3d 548, 551 (D.C. Cir. 1994).  To meet its burden, the agency may submit affidavits or declarations that explain in reasonable detail the scope and method of the agency's search.  Perry v. Block, 684 F.2d 121, 126 (D.C. Cir. 1982).  In the absence of contrary evidence, such affidavits or declarations are sufficient to demonstrate an agency's compliance with the FOIA.  Id. at 127.  If the record "leaves substantial doubt as to the sufficiency of the search, summary judgment for the agency is not proper."  Truitt v. Dep't of State, 897 F.2d at 542; see also Valencia-Lucena v. United States Coast Guard, 180 F.3d at 326.

*A.  The FBI's Search of its Central Records System*

In its Central Records System ("CRS"), the FBI maintains its "administrative, applicant, criminal, personnel, and other files compiled for law enforcement purposes."  1st Hardy Decl. ¶ 14.  CRS files are located throughout the FBI's network of offices, with some housed at FBIHQ and others maintained at regional field offices.  Id.  The records are organized

by subject matter, which "may relate to an individual, organization, company, publication, activity, or foreign intelligence matter." <u>Id</u>.

The FBI locates records within the CRS by conducting a computerized search of a digital file index. 1st Hardy Decl. ¶¶ 15-16. Entries in the index are either "main" entries or "reference" entries. <u>Id</u>. ¶ 16. The former "carr[y] the name corresponding with a subject of a file contained in the CRS"; the latter "are generally only a mere mention or reference to an individual, organization, or other subject matter contained in a document located in another 'main' file." <u>Id</u>.

The FBI responded to Ms. Clemente's request for "any informant file on Mr. Scarpa," 2d Am. Compl., Ex. 4 at 1, by "search[ing] the CRS using subject's name." 1st Hardy Decl. ¶ 20. That search yielded "one main informant file," containing "approximately 1,170 pages." <u>Id</u>. The FBI then searched within those 1,170 pages for the more specific documents described by Ms. Clemente in her First July 9 Letter: "all records pertaining to New Orleans Mafia Chief Carlos Marcello" and "all records pertaining to any trip made by Scarpa to Costa Rica." 2d Am. Compl., Ex. 4 at 1; <u>see</u> 1st Hardy Decl. ¶ 21. Although the agency did locate some documents concerning Carlos Marcello, it found no records on any travel by Mr. Scarpa to Costa Rica. <u>Id</u>.

Ms. Clemente argues that this search process was inadequate because the FBI did not follow the instructions contained in her Second July 9 Letter. The agency restricted its search to informant files stored at FBIHQ instead of looking for responsive documents in all files maintained by the agency's headquarters and field offices. PMSJ at 16. It did not search its Electronic Surveillance index or look for documents that refer to Mr. Scarpa but fail to appear in

his "main" informant file. Id. It ran its queries using only Mr. Scarpa's full legal name, rather than nicknames or aliases. Id. at 17.

The FBI, however, was not required to comply with any requests contained solely in the Second July 9 Letter, because Ms. Clemente has failed to provide the Court with any evidence that the FBI ever received that letter. "Without such evidence to overcome the FBI's sworn statement that it has no record of receiving" the letter, Ms. Clemente's claims related to that letter "must fail." Tunchez v. U.S. Dep't of Justice, Civil Action No. 09-473, 2010 WL 2202506, at *3 (D.D.C. June 3, 2010). An agency does not "improperly withhold records" in violation of the FOIA "if it [has] not receive[d] a request for" them. Id.; see also Ye v. Holder, 624 F. Supp. 2d 121, 124 (D.D.C. 2009) (where a plaintiff has "failed to create a disputed issue of fact regarding whether the [agency] received his FOIA request," the Court must conclude that he has failed to exhaust his administrative remedies, and his FOIA claim must be dismissed).

Perhaps anticipating this result, Ms. Clemente insists that the FBI must be ordered to fulfill the requests made in the Second July 9 Letter — even if that letter never actually arrived at FBIHQ in the mail — because "the FBI has had [the letter] in its possession since December 4, 2008," when the plaintiff appended a copy of it to her motion to file a second amended complaint. PMSJ Reply at 3. Ms. Clemente has overstated her rights under the FOIA, which requires her to exhaust her administrative remedies with respect to a particular FOIA request before she may seek a judicial order compelling the agency to produce the records sought. See Hidalgo v. FBI, 344 F.3d 1256, 1258-59 (D.C. Cir. 2003). A plaintiff has not met the exhaustion requirement if she first presents her FOIA request in litigation. See Ye v. Holder, 624 F. Supp. 2d at 124.

Ms. Clemente also argues that, even if the FBI did not receive the Second July 9 Letter, it failed to conduct an adequate search in response to the letters that it did receive. PMSJ at 17. She suggests that, because her initial letter to the FBI asked for the "'entire UNREDACTED FBI file of Gregory Scarpa, Sr.,'" the FBI acted improperly in seeking only "main" files on Mr. Scarpa, rather than finding any document in any file that made reference to him. PMSJ Reply at 4. According to Ms. Clemente, when she used the phrase "FBI file of Gregory Scarpa, Sr.," the FBI should have understood her to mean that she was seeking "all FBI materials on Scarpa," regardless of their location in any particular file. PMSJ Reply at 4-5. That argument is unpersuasive. Ms. Clemente "clarif[ied]" the nature of her FOIA request in the First July 9 Letter. See PMSJ, Ex. 5 at 1. She stated that her "request for the file on Mr. Gregory Scarpa, Sr. is directed to *any informant file on* Mr. Scarpa." Id. (emphasis added). Contrary to Ms. Clemente's arguments, that statement may quite reasonably be read to mean that Ms. Clemente's request was limited to informant files and, more specifically, to informant files whose primary subject matter is Mr. Scarpa. The FBI conducted a search reasonably calculated to locate files falling into that category.

In her supplemental memorandum filed in support of her motion for summary judgment, Ms. Clemente identifies several categories of documents that, based on her knowledge of Mr. Scarpa and his activities, she believes should have appeared in Mr. Scarpa's FBI file, but were not included in it. P. Supp. at 2-4. For example, according to Ms. Clemente, "Scarpa was at the height of his activities" related to the Mafia in the early 1990s, and the FBI therefore must have collected many records documenting those activities. Id. at 3. But only 36 pages of the documents released to Ms. Clemente discuss that time period. Id. By Ms. Clemente's logic, the

FBI's search for documents must have been inadequate, because it did not yield the records that she expected. See id. It is established, however, that "[t]he adequacy of a search is not determined by its results, but by the method of the search itself." Harrison v. Fed. Bureau of Prisons, 681 F. Supp. 2d 76, 81-82 (D.D.C. 2010) (citing Weisberg v. Dep't of Justice, 745 F.2d 1476, 1485 (D.C. Cir. 1984)). Ms. Clemente cannot demonstrate that the FBI's search was inadequate by listing hypothetical documents that she believes could and should have been located and released to her.

### B. Placeholder Pages

Two pages among those released to Ms. Clemente by the FBI consist of "placeholder" sheets inserted into Mr. Scarpa's informant file in 1994 and 1983, respectively, to indicate that pages previously held in the file had been re-indexed and placed in other locations. See D. Supp., Ex. C at 21, 41; 2d Hardy Decl. ¶ 49 & n.16-17. One placeholder marks the spot previously occupied in Mr. Scarpa's file by a set of documents that were transferred in 1994 to the FBI's New York field office. 2d Hardy Decl. ¶ 49. The second placeholder was substituted in 1983 for a single document that "was mis-indexed" and is "not responsive to [Ms. Clemente's FOIA] request." Id.

Ms. Clemente argues that all documents underlying the placeholders should be released to her. See P. Supp. at 4-5. With regard to the set of documents corresponding to the first placeholder, she asserts that the FBI is required to retrieve those documents from its New York field office. Id. at 5. As for the document underlying the second placeholder, she simply contends that she "requested all documents in Scarpa's informant file(s). This document meets

that description and must be provided." Id. Neither of those contentions has merit. First, in response to a FOIA request made only to FBIHQ, the FBI is not required to locate, retrieve, or release documents located not at FBIHQ, but at regional field offices. See 28 C.F.R. §§ 16.3, 16.41 (requests for records held at an FBI field office must be made directly to that office, not to FBI headquarters); Fischer v. U.S. Dep't of Justice, 596 F. Supp. 2d 34, 43 n.9 (D.D.C. 2009) ("[T]he FBI is not obligated to undertake a search of its field offices' records when a requester does not submit his request there."). Second, the document determined to have been mis-indexed to Mr. Scarpa's file and transferred to the appropriate file in 1983 is plainly not "in Scarpa's informant file," and has not been in decades. Consequently, it is not responsive to Ms. Clemente's request, and the FBI was not obligated to produce it.

## V.  DOCUMENTS WITHHELD PURSUANT TO STATUTORY EXEMPTIONS

Under the FOIA, an agency may withhold documents responsive to a FOIA request only if the responsive documents fall within one of the enumerated statutory exemptions. See 5 U.S.C. § 552(b); see also Dep't of Defense v. Fed. Labor Relations Auth., 510 U.S. 487, 494 (1994). The agency bears the burden of justifying any withholding. See Bigwood v. U.S. Agency for Int'l Dev., 484 F. Supp. 2d at 74. To enable the Court to determine whether documents properly were withheld, the agency must provide a detailed description of the information withheld through the submission of a so-called "Vaughn index," sufficiently detailed affidavits or declarations, or both. Id.; see also Oglesby v. Dep't of the Army, 79 F.3d 1172, 1178 (D.C. Cir. 1996); Vaughn v. Rosen, 484 F.2d at 827-28. The Vaughn index and/or accompanying affidavits or declarations must "provide[] a relatively detailed justification [for

any nondisclosure], specifically identif[y] the reasons why a particular exemption is relevant and correlat[e] those claims with the particular part of a withheld document to which they apply." Judicial Watch, Inc. v. FDA, 449 F.3d 141, 146 (D.C. Cir. 2006) (quoting Mead Data Cent., Inc. v. Dep't of the Air Force, 566 F.2d 242, 251 (D.C. Cir. 1977)). While there is no set form for a Vaughn Index, the agency should "disclose as much information as possible without thwarting the exemption's purpose." Hall v. Dep't of Justice, 552 F. Supp. 2d 23, 27 (D.D.C. 2008) (quoting King v. Dep't of Justice, 830 F.2d 210, 224 (D.C. Cir. 1987)).

The FBI processed 1,153 pages of documents responsive to Ms. Clemente's FOIA request. D. Supp. SMF ¶ 1 n.1. None of those pages has been withheld entirely, but chunks of text, in some cases very large ones, were redacted from numerous documents. To justify those redactions, the FBI has not addressed each redaction individually, but has opted for a categorical approach. In a declaration submitted to the Court along with copies of the redacted documents released to Ms. Clemente, David M. Hardy, the Section Chief of the Record/Information Dissemination Section of the FBI's Records Management Division in Winchester, Virginia, describes the various categories of information withheld as exempt from disclosure. See 1st Hardy Decl. ¶¶ 23-68; 2d Hardy Decl. ¶¶ 12-48. Each category is identified first by the section of the FOIA that, according to the FBI, authorizes the agency to withhold the information in question. Then each category is defined to include only a particular type of information — names or identifying information of FBI agents, for example, or the source codes assigned by the FBI to its confidential informants. The FBI has connected these categories to the redactions appearing in the released documents by labeling the site of each redaction with a code corresponding to a particular category.

21

Such a categorical approach to the task of justifying nondisclosure is permissible

so long as it serves the primary functions of a Vaughn index:

> . . . forc[ing] the government to analyze carefully any material
> withheld, . . . enabl[ing] the trial court to fulfill its duty of ruling on
> the applicability of the exemption, and . . . enabl[ing] the adversary
> system to operate by giving the requester as much information as
> possible, on the basis of which [s]he can present [her] case to the
> trial court.

Judicial Watch, Inc. v. FDA, 449 F.3d at 146 (quoting Keys v. U.S. Dep't of Justice, 830 F.2d

337, 349 (D.C. Cir. 1987)) (internal quotation marks omitted). Where, as here, an agency has not

described each chunk of redacted text individually but instead has grouped it into a descriptive

category, the agency satisfies its obligations under the FOIA only if the context of the redacted

material suffices to show that the information withheld falls within the relevant category and

hence is truly exempt from disclosure. See Schoenman v. FBI, 604 F. Supp. 2d 174, 197-98

(D.D.C. 2009) (citing King v. U.S. Dep't of Justice, 830 F.2d 210, 220 (D.C. Cir. 1987)). Ms.

Clemente argues both that the categories enumerated by the FBI do not describe information

uniformly exempt from disclosure under the FOIA, and that the FBI has failed to demonstrate

that the text redacted in numerous instances actually falls into a relevant category of information.

Evaluating these claims with respect to each type of exemption claimed by the FBI, the Court

finds that most, but not all, of the categories of material described by the FBI are indeed exempt

from disclosure. With respect to some redactions, however, the FBI has not shown that the

redacted information falls within any of the categories enumerated. The FBI therefore will be

required to supplement its Vaughn index.

*A. Exemption 2*

Exemption 2 shields from disclosure information that is "related solely to the internal personnel rules and practices of an agency."  5 U.S.C. § 552(b)(2).  The phrase "personnel rules and practices" is interpreted to include not only "minor employment matters" but also "other rules and practices governing agency personnel."  Crooker v. Bureau of Alcohol, Tobacco and Firearms, 670 F.2d 1051, 1056 (D.C. Cir. 1981) (en banc).  The "information need not actually *be* 'rules and practices' to qualify under [E]xemption 2, as the statute provides that a matter 'related' to rules and practices is also exempt."  Schwaner v. Dep't of the Air Force, 898 F.2d 793, 795 (D.C. Cir. 1990) (emphasis added).

Exemption 2 applies if the information that is sought meets two criteria.  See Pub. Citizen, Inc. v. Office of Mgmt. and Budget, 569 F.3d 434, 439 (D.C. Cir. 2009).  First, such information must be "used for predominantly internal purposes."  Crooker v. Bureau of Alcohol, Tobacco and Firearms, 670 F.2d at 1074; see Nat'l Treasury Employees Union v. United States Customs Serv., 802 F.2d 525, 528 (D.C. Cir. 1985).  Second, the agency must show either that "disclosure may risk circumvention of agency regulation," or that "the material relates to trivial administrative matters of no genuine public interest."  Schwaner v. Dep't of the Air Force, 898 F.2d at 794 (citations omitted).

The FBI has withheld the following categories of information on the ground that they fall within the scope of Exemption 2: "permanent source symbol numbers" that are "assigned to confidential informants who report information to the FBI on a regular basis," 1st Hardy Decl. ¶ 27; the numbers of FBI files containing documentation relating to a confidential source, id. ¶ 29; "operational funds that were dispensed during the course of a law enforcement

investigation," id. ¶ 32; "the number of current informants reporting on [La Cosa Nostra] issues," id. ¶ 33; and "techniques or procedures used in law enforcement investigations or prosecutions." Id. ¶ 34. Ms. Clemente challenges the applicability of Exemption 2 to each of these types of information.

FBI "informant codes plainly fall within the ambit of Exemption two" because "[t]he means by which the FBI refers to informants in its investigative files is a matter of internal significance in which the public has no substantial interest." Lesar v. U.S. Dep't of Justice, 636 F.2d 472, 486 (D.C. Cir. 1980); see also Voinche v. FBI, 46 F. Supp. 2d 26, 30 (D.D.C. 1999) ("[T]here is no significant public interest in the disclosure of identifying codes or similar information with respect to informants."). Ms. Clemente argues that in this case the public has an interest in knowing the informant codes contained in Mr. Scarpa's file because disclosure would "help[] foster accountability by enabling the public to track the information traceable to a corrupt informant, . . . prevent[] the victimization of innocents, and . . . assist[] in countering cover-ups." PMSJ at 31-32. Ms. Clemente does not explain how disclosure of source codes would accomplish any of those vaguely described ends. Her conclusory assertion fails to demonstrate that there is any public interest in disclosure of the source codes. The Court concludes that the FBI properly invoked Exemption 2 in withholding them. By the same logic, the file numbers associated with particular source codes are also exempt from disclosure.

Ms. Clemente also challenges the FBI's decision to invoke Exemption 2 in withholding the number of "current informants reporting on [Mafia] issues." 1st Hardy Decl. ¶ 33. As an initial matter, the Court rejects the proposition that the number of Mafia informants used by the FBI is a matter "related solely to the internal personnel rules and practices of [the]

agency."  5 U.S.C. § 552(b)(2).  Furthermore, the Court agrees with Ms. Clemente that the

informants to which the redacted passages appear to refer do not qualify as "current" by any

stretch of the imagination.  At least some of the documents from which a reference to a number

of informants has apparently been redacted date back to the early 1960s.  See, e.g., DMSJ, Ex. I

at 81 (dated 1962), 109 (dated 1962), 142 (dated 1963).  Informants who were active four

decades ago are presumably no longer "current."  It is difficult to imagine how disclosure of the

number of individuals informing on the Mafia in the 1960s would create a risk of circumvention

of the law in the 2010s.  If any references in Mr. Scarpa's file to the number of FBI informants

reporting on the Mafia may *reasonably* be characterized as "current," the FBI may identify those

references in a subsequent motion for summary judgment and attempt to justify the withholding

of those references by invoking Exemption 7(E).  References having only historical significance,

however, are not protected by either Exemption 2 or Exemption 7(E) and must be disclosed.

The FBI's use of Exemption 2 to justify the withholding of information

concerning investigatory techniques and operational funds also warrants scrutiny.  According to

the FBI, if the public had access to information concerning "operational funds that were

dispensed during the course of a law enforcement investigation," some individuals might gain

"insight" into the manner in which investigations are funded and use that knowledge "to exhaust

the FBI's funding of a particular investigation."  1st Hardy Decl. ¶ 32.  This line of argument

strains credulity, particularly because the FBI has made no attempt to expand upon it by

providing concrete examples of how the feared "exhaustion" of FBI funding could occur.  "[I]t is

the Bureau's burden to show a significant risk that the law will be circumvented by making the

disclosure [at issue] *in this case*."  Hidalgo v. FBI, 541 F. Supp. 2d 250, 254 (D.D.C. 2008)

(emphasis in original). The FBI has made no more than a cursory attempt to do so here, and its argument as a result is rejected. Exemption 2 does not apply to operational funds in this case. See Hidalgo v. FBI, 541 F. Supp. 2d at 254 (reaching the same result in response to a similar argument).

Finally, the FBI has claimed the protection of Exemption 2, along with Exemption 7(E), in redacting information said to pertain to law enforcement "techniques and procedures" whose effectiveness could be reduced by disclosure. See 1st Hardy Decl. ¶ 34-35. With regard to this category of withheld information, the FBI's Vaughn index is insufficient. Exemptions 2 and 7(E) both shield law enforcement techniques from disclosure only to the extent that public knowledge of those techniques could result in the circumvention of statutes or regulations. See, e.g., Holt v. U.S. Dep't of Justice, Civil Action No. 09-1515, 2010 WL 3386016, at *16 (D.D.C. Aug. 26, 2010). But the FBI has provided the Court with no means by which it can determine whether the information withheld relates to techniques whose disclosure could result in evasion of the law; the agency has made not even a cursory attempt to describe the type of techniques and procedures allegedly detailed in redacted text, and the context of the redactions reveals little to nothing. "[A]n affidavit that contains merely a categorical description of redacted material coupled with categorical indication of anticipated consequences of disclosure is clearly inadequate." Campbell v. U.S. Dep't of Justice, 164 F.3d at 30 (citation and internal quotation marks omitted). "The vital result [of a Vaughn index] must be an adequate representation of context which, when combined with descriptions of deletions, enables de novo review of the propriety of withholding." King v. U.S. Dep't of Justice, 830 F.2d at 221. To permit the Court

to evaluate its claims of exemption in this case, the FBI must supplement its <u>Vaughn</u> index to supply greater detail about the content of redacted text.

### B. Exemption 7

Exemption 7 protects from disclosure "records or information compiled for law enforcement purposes," but only to the extent that disclosure of such records would cause an enumerated harm.  5 U.S.C. § 552(b)(7); <u>see</u> <u>Fed. Bureau of Investigation v. Abramson</u>, 456 U.S. 615, 622 (1982).  In order to withhold materials properly under Exemption 7, an agency must establish that the records at issue were compiled for law enforcement purposes, and that the material satisfies the requirements of one of the subparts of Exemption 7.  <u>See</u> <u>Pratt v. Webster</u>, 673 F.2d 408, 413 (D.C. Cir. 1982).

As a threshold matter, Ms. Clemente asserts that the FBI is not entitled to invoke the protection of Exemption 7 with regard to any information contained in Mr. Scarpa's file because that information was not compiled for law enforcement purposes, but rather "in violation of law enforcement purposes."  PMSJ at 21.  According to Ms. Clemente, Mr. Scarpa engaged in illegal activities at the FBI's behest, and therefore "it cannot be contended that the records and information at issue were compiled for law enforcement purposes."  <u>Id</u>. at 22.

This argument is unpersuasive.  Mr. Hardy avers that the records in Mr. Scarpa's file "pertain to the investigation of the activities of subject's involvement as a TE informant for the FBI and his involvement in [La Cosa Nostra]."  1st Hardy Decl. ¶ 40.  The content of the records is consistent with Mr. Hardy's declaration.  Even if the Court assumes that the FBI's deployment of Mr. Scarpa sometimes contravened the law, there is no evidence that the records

in question were compiled in violation of the law or for the purpose of furthering a violation of the law. Indeed, there is no evidence that the records were compiled for any purpose other than that supplied by the FBI: documenting the activities of a criminal informant. Such documentation advances the FBI's interest in monitoring the behavior and interactions of an important source of information and so serves a law enforcement purpose. The information redacted from Mr. Scarpa's file therefore is shielded by Exemption 7 to the extent that the FBI is able to show that disclosure would cause one of the harms identified in the FOIA.

### 1. Exemption 7(C)

Exemption 7(C) protects from disclosure information in law enforcement records that "could reasonably be expected to constitute an unwarranted invasion of personal privacy." 5 U.S.C. § 552 (b)(7)(C). "To determine whether Exemption 7(C) applies, [courts] 'balance the privacy interests that would be compromised by disclosure against the public interest in release of the requested information.'" Sussman v. United States Marshals Serv., 494 F.3d 1106, 1115 (D.C. Cir. 2007) (quoting Davis v. United States Dep't of Justice, 968 F.2d 1276, 1282 (D.C. Cir. 1992)); see Beck v. Dep't of Justice, 997 F.2d 1489, 1491 (D.C. Cir. 1993).

The FBI claims that five types of information were properly withheld from Ms. Clemente pursuant to Exemption 7(C): "names and identifying information of FBI [special agents] . . . and support employees," 1st Hardy Decl. ¶ 42; "names of third parties . . . [who] were of investigative interest to the FBI," id. ¶ 45; "names of third parties who are merely mentioned in various communications" documented in Mr. Scarpa's file, id. ¶ 48; "the name and identifying information concerning local law enforcement personnel from the New York City Police

Department," id. ¶ 51; and "the names and/or identifying data of individuals who assisted the FBI by providing information within the records responsive to plaintiff's request." Id. ¶ 53. With respect to all of these categories of information, Ms. Clemente objects that the FBI did not properly balance the privacy interests at stake against the public interest in disclosure. See PMSJ at 25-26. First, she objects that, in weighing the privacy interests of individuals, the FBI apparently made "no effort . . . to determine whether these persons are even alive, and thus potentially the subject of a privacy claim." Id. at 25. Second, she disputes the FBI's conclusory finding that no public interest would be served by the disclosure of any of the names or identifying information at issue because such disclosure would "not shed light on the operations and activities of the FBI." 1st Hardy Decl. ¶ 47; see also id. ¶¶ 44, 50, 51, 53 (repeatedly finding no public interest in disclosure).

An individual's death diminishes, but does not eliminate, her privacy interest in the nondisclosure of any information about her that appears in law enforcement records. See Campbell v. U.S. Dep't of Justice, 164 F.3d at 33-34; Davis v. Dep't of Justice, 460 F.3d at 98. Consequently, in balancing an individual's privacy interests against any public interest in disclosure as required by Exemption 7(C), an agency must typically take "the fact of death . . . into account." Davis v. Dep't of Justice, 460 F.3d at 98. The agency can only do that if it first "ma[k]e[s] a reasonable effort to ascertain life status." Id. As Ms. Clemente points out, there is no evidence in the record to suggest that the FBI attempted to "ascertain [the] life status" of any of the individuals identified in Mr. Scarpa's informant file. In its opposition to Ms. Clemente's motion for summary judgment, the FBI notes that "the FBI's 100 year rule (whereby the FBI assumes that people with a birthday less than 100 years ago are still alive and therefore are

29

entitled to the privacy protections provided by Exemptions 6 and 7(C)) has been upheld by this Circuit." Opp. to PMSJ at 3-4. While that statement is true, it is immaterial here because Mr. Hardy indicates nowhere in his declarations that the FBI actually applied the 100-year rule in this case.

The effect of an individual's death on her privacy interests need not be factored into an Exemption 7(C) balancing test, however, where no public interest would be served by the disclosure of that individual's name or other identifying information. Even after death, a person retains some privacy interest in her identifying information, see Davis v. Dep't of Justice, 460 F.3d at 98, and "something, even a modest privacy interest, outweighs nothing every time." Consumers' Checkbook, Center for the Study of Servs. v. U.S. Dep't of Health & Human Servs., 554 F.3d 1046, 1056 (D.C Cir. 2009) (citation and internal quotation marks omitted). To render the life status of any individual or group of individuals relevant, then, Ms. Clemente must "(1) show that the public interest sought to be advanced is a significant one, an interest more specific than having the information for its own sake, and (2) show the information is likely to advance that interest." Sussman v. U.S. Marshals Serv., 494 F.3d at 1115. "[T]he only public interest relevant for purposes of Exemption 7(C) is one that focuses on the citizens' right to be informed about what their government is up to." Id. (citation and internal quotation marks omitted).

Ms. Clemente's only attempt to demonstrate that disclosure of the identifying information redacted by the FBI would serve the public interest is a blanket assertion that "[t]he redacted information sheds light on the operations or activities of the FBI because it shows who did what, when that [sic] carried out or thwarted FBI operations and activities." PMSJ at 27.

Ms. Clemente further contends that "[t]he public interest in disclosure is overwhelming" because "this is a case which involves violent crimes, including murder, committed by an FBI Top Echelon informant who was on the FBI payroll when he committed these crimes and covered them up, and whose handler was aware of these activities." PMSJ at 26-27. While the Court agrees that the public has a significant interest in learning about any misuse of criminal informants by the FBI, Ms. Clemente has failed to explain how that interest would be advanced by the release of the names and identifying information of all individuals mentioned in Mr. Scarpa's file. At this stage in the litigation, however, the Court declines to make a definitive ruling as to that issue because it finds that the FBI's <u>Vaughn</u> index is not sufficiently detailed to permit the plaintiff to make her case regarding the public interest in the disclosure of information withheld under Exemption 7(C).

The FBI has redacted large amounts of information on the ground that the withheld material consists of "names and/or identifying information" of FBI employees or third parties. <u>See</u> 1st Hardy Decl. at 22-28 (listing pages on which redactions appear); 2d Hardy Decl. at 14-20 (same). In many cases, the Court is able to confirm from the context of the redactions that the withheld information does indeed consist of no more than names or similar information; when a small amount of text is redacted after the title "Special Agent," it is easy to conclude that the missing text names an FBI agent. <u>See</u>, <u>e.g.</u>, DMSJ, Ex. I at 472. But context does not make clear the nature of a significant amount of information withheld by the FBI as subject to Exemption 7(C). Where the FBI withholds large chunks of text, sometimes comprising at least half of the text on a page, the Court simply cannot accept without further evidence that all of the information redacted could be classified as "identifying." <u>See</u>, <u>e.g.</u>, <u>id</u>. at 404, 418, 703, 744,

924, 942; see also Schoenman v. FBI, 604 F. Supp. 2d at 198 (finding that a broad, categorical description of large amounts of redacted text "does not . . . provide the Court or [p]laintiff with sufficient information as to the actual material withheld).  Furthermore, the plaintiff cannot be expected to make a cogent argument regarding any possible public interest in disclosure if she has little idea of the nature of the information that has been withheld.  In each instance in which it is not clear from context that information redacted as subject to Exemption 7(C) reveals a name or other basic identifying information, such as an address — and particularly where a substantial amount of text has been redacted — the FBI must supplement its Vaughn index with individualized and more detailed descriptions of the information not disclosed.  Only then will the Court be able to evaluate the propriety of the FBI's claims regarding Exemption 7(C).

### 2.  Exemption 7(D)

Exemption 7(D) protects from disclosure records or information compiled for law enforcement purposes that

> could reasonably be expected to disclose the identity of a confidential source . . . [who] furnished information on a confidential basis, and, in the case of a record or information compiled by a criminal law enforcement authority in the course of a criminal investigation. . . , information furnished by a confidential source.

5 U.S.C. § 552(b)(7)(D).  A confidential source may be an individual, such as a private citizen or paid informant, or it may be a state, local, or foreign law enforcement agency.  Zavala v. Drug Enforcement Admin., 667 F. Supp. 2d 85, 101 (D.D.C. 2009); Lesar v. Dep't of Justice, 636 F.2d at 491.  There is no presumption that a source is confidential for purposes of Exemption 7(D) solely because the source provides information to a law enforcement agency in the course of a

criminal investigation.  See U.S. Dep't of Justice v. Landano, 508 U.S. 165, 181 (1993).  Rather,

a source's confidentiality is determined on a case-by-case basis.  Id. at 179-80.  "A source is

confidential within the meaning of 7(D) if the source provided information under an express

assurance of confidentiality or in circumstances from which such an assurance could reasonably

be inferred."  Williams v. FBI, 69 F.3d 1155, 1159 (D.C. Cir. 1995) (citing U.S. Dep't of Justice

v. Landano, 508 U.S. at 170-74).

        The FBI has withheld the following categories of information pursuant to

Exemption 7(D): (1) the symbol numbers of confidential sources, 1st Hardy Decl. ¶ 56; (2) the

file numbers of confidential sources, id. ¶ 57; (3) "information provided by source symbol

numbered informants," id. ¶ 60; (4) "information provided to the FBI by a local law enforcement

agency," id. ¶ 61; and (5) "names and information of third parties who were interviewed . . .

under an implied grant of confidentiality."  Id. ¶ 63.  The Court has already approved the

withholding of the first two categories of information pursuant to Exemption 2 and so does not

discuss them further.  With regard to the remaining categories, Ms. Clemente argues that the FBI

has failed to demonstrate that the sources in question provided information under an express or

implied grant of confidentiality, as required by Landano.  She is incorrect.

        As to "source symbol numbered informants," Mr. Hardy explains in his

declaration that it is the FBI's practice to assign source symbols to informants only if those

individuals "report information to the FBI on a regular basis pursuant to an 'express' grant of

confidentiality."  1st Hardy Decl. ¶ 27.  This averment is sufficient to demonstrate that those

informants qualify as "confidential source[s]" within the meaning of the FOIA.  See, e.g., Amuso

v. U.S. Dep't of Justice, 600 F. Supp. 2d 78, 99 (D.D.C. 2009) (informants assigned a source

code operate under an express grant of confidentiality and so are protected by Exemption 7(D)).

Informants to whom no source code was assigned but who supplied information to the FBI regarding the Mafia are also protected confidential sources. "[W]hatever his relation to the crime [about which he provides information], an informant is at risk" — and hence, entitled to an implied grant of confidentiality — "to the extent the criminal enterprise he exposes is of a type inclined toward violent retaliation." Mays v. Drug Enforcement Admin., 234 F.3d 1324, 1330 (D.C. Cir. 2000). It is difficult to conceive of a "criminal enterprise" known to be more "inclined toward violent retaliation" than the Mafia. Individuals who provide information on the Mafia to the FBI therefore are to be considered confidential sources. Ms. Clemente objects that the FBI has not demonstrated that the sources in question here were reporting on any particular "'crime' . . . which would warrant an implied promise of confidentiality." PMSJ at 35. But the Mafia is an organization formed for the purpose of coordinating and committing crimes. Any information furnished to the FBI about the organization could aid in the detection and prosecution of crime — and lead to retaliation against the informant. Given the nature of the criminal enterprise in question, there is no need for the FBI to identify specific crimes about which particular informants reported.

Finally, the Court need not address the FBI's claims of confidentiality for information provided by local law enforcement agencies for the simple reason that none of the information withheld by the FBI appears to fall into that category. The FBI has assigned the code "b(7)(D)-4" to "information provided to the FBI by a local law enforcement agency." 1st Hardy Decl. ¶ 61. Although Mr. Hardy claims in his declaration that information falling into that category was redacted from several of the pages released to Ms. Clemente, an examination of those pages reveals that none of the redactions appearing in them is labeled with the b(7)(D)-4 code. See id. at 32 n.19 (listing pages). Because it appears that no information was redacted on

the ground that it was furnished confidentially by local law enforcement, the Court will not address the applicability of Exemption 7(D) to this category of information. Of course, if the omission of the b(7)(D)-4 code was accidental, and the FBI inadvertently substituted a different code for that one in the places in which it should have appeared, the FBI must correct that error before it again moves for summary judgment.

### 3. Exemption 7(E)

Exemption 7(E) protects from disclosure records or information compiled for law enforcement purposes, but only to the extent that the production of such law enforcement records or information "would disclose techniques and procedures for law enforcement investigations or prosecutions, or would disclose guidelines for law enforcement investigations or prosecutions if such disclosure could reasonably be expected to risk circumvention of the law." 5 U.S.C. § 552(b)(7)(E); see Long v. United States Dep't of Justice, 450 F. Supp. 2d 42, 79 (D.D.C. 2006). The FBI has cited this exemption in withholding two categories of information: (1) information describing "techniques and procedures used in law enforcement investigations regarding the handling of confidential informants," 1st Hardy Decl. ¶ 66, and (2) "the number of current informants reporting on [Mafia] issues" and other "logistical details of an FBI undercover operation." Id. ¶ 68.

As the Court explained above in addressing the FBI's claims regarding Exemption 2, see supra at 27-28, the FBI must supplement its Vaughn index in order to describe more fully the information that it has withheld as related to law enforcement techniques whose disclosure would "risk circumvention of the law." The same is true of redacted text that allegedly betrays "logistical details of an FBI undercover operation." Exemption 7(E) is not concerned with mere

"logistical details"; it is meant to protect investigatory techniques whose disclosure could result in evasion of arrest or other enforcement actions. To convince the Court that the information withheld is subject to the exemption, the FBI cannot rely upon the vaguely worded categorical description it has provided. It must provide evidence from which the Court can deduce something of the nature of the techniques in question.

Finally, as explained in the Court's discussion of the FBI's redactions pursuant to Exemption 2, see supra at 25-26, the FBI has failed to demonstrate that any of the documents released to Ms. Clemente make references to the number of informants *currently* reporting to the FBI regarding the Mafia. References to the number of informants operative in the 1960s do not qualify for protection under Exemption 7(E) for the same reason that they do not merit it under Exemption 2. See id. To persuade the Court that any references to the number of the FBI's informants should be protected from disclosure, the FBI must demonstrate in a subsequent motion for summary judgment that those references may reasonably be construed as "current."

### 4. Inconsistencies

In addition to her objections to the FBI's invocation of specific exemptions, Ms. Clemente asserts generally that "inconsistencies in the processing" of her request "undermine the credibility of the FBI's exemption claims." PMSJ at 41. To support that contention, she cites instances in which, for example, the FBI discloses the name of an individual but redacts his "place of residence," or "releases the name of one person who is a business partner in a gravel business but redacts the other." Id. The FBI processed more than 1100 pages of documents in response to Ms. Clemente's request. Certain minor inconsistencies are unsurprising and

practically inevitable.  The Court is unpersuaded that such inconsistencies undermine the FBI's

credibility at all, let alone so thoroughly that the agency's exemption claims must be rejected out

of hand.

## VI.  CONCLUSION

For the foregoing reasons, the Court will grant Ms. Clemente's motion for

summary judgment with regard to Count II of her complaint, which challenges the FBI's denial

of her request for a fee waiver.  All pending motions for summary judgment are denied without

prejudice as to the remaining two counts of the complaint.  The FBI shall supplement its <u>Vaughn</u>

index as directed in this Opinion.  The Court is aware that the number of documents involved in

this case is substantial.  If the parties can agree on a representative sample of documents for

which the FBI will produce a more detailed <u>Vaughn</u> index, they should do so.  <u>See</u> <u>Fischer v.</u>

<u>U.S. Dep't of Justice</u>, Civil Action No. 07-2037, 2010 WL 2745811, at *10 (D.D.C. July 13,

2010) ("'Representative sampling is an appropriate procedure to test an agency's FOIA

exemption claims when a large number of documents are involved.'" (quoting <u>Bonner v. Dep't</u>

<u>of State</u>, 928 F.2d 1148, 1151 (D.C. Cir. 1991)).  Both parties may then file updated motions for

summary judgment if necessary.  To facilitate the accomplishment of all of these tasks, the

parties are directed to file a proposed case management plan and schedule for future proceedings

in this case on or before October 13, 2010.

SO ORDERED.


/s/_____
PAUL L. FRIEDMAN
United States District Judge

DATE:   September 28, 2010